UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _08/30/2023__
```

-----------------------------------------------------------------------X
                                                                       :
GRAIN D'OR LLC,                                                        :
                                                                       :
                                  Plaintiff,                           :
                                                                       :                    21-cv-10652 (LJL)
                     -v-                                               :
                                                                       :                    OPINION AND ORDER
INBAR WIZMAN,                                                          :
                                                                       :
                                  Defendant.                           :
                                                                       :
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff Grain D'Or LLC ("Plaintiff" or "Grain D'or") moves, pursuant to Federal Rule

of Civil Procedure 56, for summary judgment on its breach of contract claims and on the

counterclaim for fraud and what Plaintiff interprets as a counterclaim for intentional infliction of

emotional distress of defendant Inbar Wizman ("Defendant" or "Wizman").[1]  Dkt. Nos. 45, 52.

For the following reasons, Plaintiff's motion for summary judgment is granted in part and denied

in part.

---

[1] The motion for summary judgment is ostensibly made for "all claims in this case."  Dkt. No.
45.  However, Plaintiff's moving papers only present arguments with respect to Plaintiff's claims
for breach of the Exclusive Management Agreement and the Exclusive Recording Agreement,
Claims One and Two of the Complaint, and with respect to the Defendant's counterclaim for
fraud and what Plaintiff interprets as her counterclaim for intentional infliction of emotional
distress.  *See generally* Dkt. No. 1 ¶¶ 54–64; Dkt. No. 46 (identifying counterclaim of
Defendant); Dkt. No. 52 (arguments of Plaintiff).  Plaintiff does mention "unjust enrichment" in
its opening brief.  *See* Dkt. No. 52 at 7–8, 12.  However, Plaintiff's references to unjust
enrichment are made in support of its claim for restitutionary damages on its breach of contract
claims and Plaintiff does not advance a separate claim for unjust enrichment.  Accordingly,
Plaintiff has waived its right to seek summary judgment as to its Third through Eighth Causes of
Action.  *See eCommission Sols., LLC v. CTS Holdings Inc.*, 860 F. App'x 758, 759 (2d Cir.
2019) ("[T]he party seeking summary judgment always bears the burden of demonstrating 'the
absence of a genuine issue of material fact.'" (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317,
323 (1986))).

## BACKGROUND

The following facts are taken from the parties' Rule 56.1 stipulation of undisputed facts (the "Stipulation of Undisputed Facts"), *see* Dkt. No. 48, and each party's respective Rule 56.1 statements, "Plaintiff's Rule 56.1 Statement," *see* Dkt. No. 49, and "Defendant's Rule 56.1 Counterstatement," *see* Dkt. No. 53, and are construed in favor of the non-moving party.

The contractual relationships between Plaintiff and Defendant grew out of a romantic relationship between Defendant and Eudes De Crecy ("De Crecy"), who for some period of time was the Manager of Plaintiff. *See* Dkt. No. 50-1 at ECF p. 10. The two met in Israel on or about May 2017 at a restaurant where Defendant was employed as a server and they started a romantic relationship that lasted until October 17, 2020. Stipulation of Undisputed Facts ¶¶ 15–16; Dkt. No. 54 ¶ 3. At the time, Defendant was a 25-year-old amateur musician who dreamed of becoming a singer. Dkt. No. 54 ¶ 3. Defendant told De Crecy of her dream and De Crecy suggested that he assist her in the pursuit of a professional career, stating that he had the resources and relationships in the music industry to support Defendant through his company, Grain D'or. *Id.* ¶ 4. After the two had been dating for six months, De Crecy suggested to Defendant that she enter into a formal agreement for her own protection. *Id.* ¶ 6. She agreed and De Crecy's brother-in-law, Herbert Koch, an attorney in Switzerland, authored the two agreements at issue in this case. *Id.* Defendant signed the agreements with Plaintiff because De Crecy told her to sign them. Stipulation of Undisputed Facts ¶ 2.

On November 1, 2017, Grain D'or and Wizman entered into an Exclusive Management Agreement (the "Management Agreement"). Stipulation of Undisputed Facts ¶ 1; *see generally* Dkt. No. 50-1. That same day, the parties also entered into an Exclusive Recording Agreement (the "Recording Agreement"). Dkt. No. 48 ¶ 2; *see generally* Dkt. No. 50-2. The parties do not

dispute that Wizman consulted with an attorney prior to entering into both contracts.  Stipulation of Undisputed Facts ¶¶ 3–4.

The Management Agreement required Plaintiff to act as Defendant's sole and exclusive personal representative and manager for an initial period of two years, with two option periods of a year and a half each to follow unless Plaintiff submitted a notice otherwise.  Management Agreement ¶ 1.  During the term of the Management Agreement, Plaintiff was, *inter alia*, to "use best efforts to allocate reasonable time to [Defendant's] career and to do all the things necessary and desirable to promote [Defendant's] career and earnings therefrom." *Id.* ¶ 2.  Plaintiff was obligated to act as Recording Producer of Defendant under the Recording Agreement, which would terminate in the case of termination of the Management Agreement.  *Id.* ¶ 3.  In exchange for Plaintiff's efforts, Defendant agreed that Plaintiff would be entitled to be paid a sum equal to 20% of Defendant's Gross Earnings, defined to include all earnings in connection with Defendant's services reasonably related to her career in the entertainment business and copyright income to which Defendant would be entitled for the compositions of all musical works.  *Id.* ¶ 9.  Plaintiff was also entitled to any post-term earnings for a period of five years following the expiration or termination of the Management Agreement, with respect to contracts entered into or offers made during the term of the Management Agreement.  *Id.* ¶ 10.  Defendant agreed to actively pursue her career in the entertainment industry during the term of the Management Agreement.  *Id.*  Paragraph 14 of the Management Agreement provides that the "Manager shall have the right to suspend the running of the Term of this Agreement and its obligations hereunder upon written notice to Artist, if for any reason Artist . . . substantially fails to actively pursue her entertainment business career or if the ability of Artist to perform shall become

physically or mentally impaired, as a result of such impairment Artist becomes unable to comply with any of her material obligations hereunder."  *Id.* ¶ 14.

The Recording Agreement was entered into substantially concurrently with the Management Agreement and was also signed by Defendant on behalf of herself and by de Crecy on behalf of Plaintiff.  Stipulation of Undisputed Facts ¶¶ 1–2.  That Agreement gave Plaintiff the exclusive right and obligation "to produce and exploit sound recordings of musical works to be performed by" Defendant for a two-year term with two option periods of a year and a half each at the discretion of Plaintiff.  Recording Agreement ¶¶ 1, 4.  Defendant committed to perform musical works in her capacity as a singer and guitar player (the "Works") and Plaintiff agreed to record the Works with Defendant and to use its reasonable best efforts to market and promote them.  *Id.* ¶ 1.  Under Paragraph 3, Defendant agreed not to allow any person other than Plaintiff to record her performances and to exploit those performances on records for the term of the agreement.  *Id.* ¶ 3.  And, under Paragraph 5, Plaintiff agreed to provide an overall recording budget of up to $25,000 to cover the expenses for the production of one album containing eight musical works to be performed by Defendant within the first 24 months of the agreement, *i.e.*, during the initial term, and one album containing at least six recordings during each of the option periods.  *Id.* ¶ 5.  In consideration for the services rendered by Defendant and in consideration of the transfer of rights from Defendant to Plaintiff, Plaintiff agreed to pay the following fixed amounts: (1) $30,000 for the first contractual year; (2) $35,000 for the second contractual year; (3) $40,000 for the third contractual year; (4) $50,000 for the fourth contractual year; and (5) $60,000 for the fifth contractual year.  *Id.* ¶ 8.

The Management Agreement and Recording Agreement have interrelated provisions and each agreement incorporates certain terms of the other.  Paragraph 2 of the Management

Agreement provides that "there is a mutual dependence between this Agreement and the Recording Agreement.  This dependence, the specifics of which are set forth inter alia in clause 3 of this Agreement, has a potential impact on the term of this this Agreement."  In turn, Paragraph 3 of the Management Agreement required Defendant to act as "Recording Producer" under the Recording Agreement and both the Management Agreement and the Recording Agreement provided that the Recording Agreement would terminate in the case of the termination of the Management Agreement.  *See also* Recording Agreement ¶ 4.  Paragraph 12 of the Management Agreement gave Plaintiff the exclusive right and obligation to collect any and all gross earnings of Defendant to recoup its recording expenses and investments under Paragraph 5 of the Recording Agreement (namely, the recording budget plus the compensation or fees to be paid to the artistic director and to the executive producer).  Finally, Defendant agreed to cooperate with Plaintiff "in order to assure that all copyright royalties shall be paid directly to [Plaintiff] until recoupment of all [Plaintiff's] expenses and investments."  Management Agreement ¶ 4(d).  To that end, Defendant agreed to "sign payment instructions and other documents *requested by [Plaintiff]* qualifying the [Plaintiff] as the beneficial owner of all copyright royalty payments until recoupment of all expenses and investments by [Plaintiff]."  *Id.* (emphasis added).

The initial term of the Management Agreement and the Recording Agreement commenced on November 1, 2017 and continued for two years until October 31, 2019.  Stipulation of Undisputed Facts ¶¶ 26–27.  In addition, each of the Management and Recording Agreements was subject to at least two option periods that were automatically triggered provided that Plaintiff did not provide notice to the contrary.  *Id.* ¶ 28.  When Plaintiff did not send notice

to the contrary, the first option period of the Management Agreement and the Recording

Agreement commenced on November 1, 2019.  Plaintiff's Rule 56.1 Statement ¶ 39.

During the initial terms of the agreements and the option periods, Plaintiff expended

money on Defendant's development and music career.  It is undisputed that Plaintiff paid for

English language classes for Defendant and paid for a music video for Defendant's recording,

"Scared Boy."  Defendant's Rule 56.1 Counterstatement ¶¶ 14–15.  Plaintiff also paid for a

public relations agent for Defendant's music career and helped her establish a presence on social

media. *Id.* ¶¶ 21–22.  Plaintiff also claims that it organized concerts for Defendant, paid for

speakers for Defendant, paid for studio time for Defendant, paid for a piano for Defendant, and

paid for flights for Defendant to travel to her concerts.  Plaintiff's Rule 56.1 Statement ¶¶ 13,

16–20.  However, each of those assertions is disputed.  Defendant claims that De Crecy bought

Wizman the speakers and that the piano was a gift from him.  Defendant's Rule 56.1

Counterstatement ¶¶ 16, 18.  Defendant also claims that Plaintiff never organized concerts for

her and that the travel was for personal vacations for the two of them.  *Id.* ¶ 20.  Plaintiff also

paid other fees on behalf of Defendant, though Defendant disputes some of these contentions by

questioning the veracity of Plaintiff's evidence, without offering contrary evidence.  *See*

Plaintiff's Rule 56.1 Statement ¶¶ 9–12; Defendant's Rule 56.1 Counterstatement ¶¶ 9–12.

Finally, Defendant asserts that Grain D'or only purchased a microphone for her, not amplifiers,

laptops, and other musical equipment.  *Id.* ¶ 19

It is undisputed that Plaintiff paid Defendant monthly sums.  Plaintiff's Rule 56.1

Statement ¶ 4.[2]  However, the amount paid pursuant to the Recording Agreement is disputed.

---

[2] Defendant disputes this assertion on the basis that no range of months is described, Defendant's
Rule 56.1 Counterstatement ¶ 4, but submits no contrary evidence and Plaintiff's assertion is
supported by Defendant's deposition transcript, *see* Dkt. No. 51-1 at 22–23.  Thus, Defendant's

Plaintiff claims that it paid Defendant $52,500 during the first year of the contract, from November 1, 2017 to November 1, 2018; $59,200 during the second contract year, from November 1, 2018 to November 1, 2019; and $61,700 during the third contract year, from November 1, 2019 to November 1, 2020, for a total of $173,400 between December 20, 2017 and September 23, 2020. *Id.* ¶¶ 5–8.[3]  Plaintiff contends that "[t]he additional amounts paid by Grain D'or during Contract Years 1, 2 and 3 were prepaid Monthly Payments." Dkt. No. 50 ¶ 14.  However, Plaintiff presents no other evidence to support this assertion—such as communications making clear that the sums represented prepayments—and there is evidence in the record that disputes this contention.  Defendant asserts that De Crecy "used to give me cash, take me to fancy restaurants, buy me gifts" and he "would pay our living expenses including the monthly rent." Dkt. No. 54 ¶¶ 5, 11.  An email exchange between Marc Penicaud, Grain D'or's Secretary, and Defendant from early November 2020 shows that the two disputed the nature of some of the payments.  While Penicaud characterized an $8,000 payment as "part of all the monthly fees and payments," Dkt. No. 54-2 at ECF p. 1, Defendant contended that the money was given to her by De Crecy for living expenses and "was never a loan or a deposit," *id.* at ECF p. 2.  Additionally, Defendant declared that "[a]ny monies paid to me by plaintiff above the amounts specified in the [Recording Agreement] were made at De Crecy's instructions to pay our living expenses including our monthly rent." Dkt. No. 54 ¶ 20.

---

assertion does not create a dispute of fact. *See Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (The non-moving party "cannot defeat the motion by relying on . . . mere assertions that affidavits supporting the motion are not credible." (citation omitted)).

[3] Defendant states that she is unable to confirm the amount paid and its source, Defendant's Rule 56.1 Counterstatement ¶¶ 5–8, but the figures are supported by evidence submitted by Plaintiff and Defendant does not identify any contrary evidence.  Thus, Defendant has not established that there is a dispute of fact with respect to the amounts paid. *See Gottlieb*, 84 F.3d at 518.

It is undisputed that Defendant did not produce all of the recordings contemplated by the Recording Agreement.  Though Defendant contends that she delivered eight recordings as required during the initial term of the recording agreement, Defendant's Rule 56.1 Counterstatement ¶ 35, she only identified seven recordings during her deposition, Dkt. No. 55-1 at 15–17.  Plaintiff contends that during the initial period of the Recording Agreement, Defendant only delivered a total of six recordings.  Plaintiff's Rule 56.1 Statement ¶ 35.  It is undisputed that Defendant did not deliver any recordings to Plaintiff during the first option period under the Recording Agreement or during the second option period under the Recording Agreement.  Statement of Undisputed Facts ¶¶ 24–25.  However, Defendant contends that Plaintiff failed to organize any of these recordings.  Defendant's Rule 56.1 Counterstatement ¶ 37.

In October 2020, De Crecy and Defendant ended their romantic relationship.  Stipulation of Undisputed Facts ¶ 16.  On November 3, 2020, approximately two and a half weeks after the breakup, Penicaud, on behalf of Plaintiff, sent a letter to Defendant advising her that as a result of the COVID-19 pandemic, Plaintiff "has made the decision to suspend your contracts for an initial period of two months for force majeure, starting November 1st, 2020," because "the company has arrived [at] the conclusion that you are no[t] . . . in a position to pursue normally your career in this adverse context."  Dkt. No. 54-2 at ECF p. 6.  In a cover email, Penicaud stated that the decision was not "directed to anyone in particular and not related to any personal matter"; he advised her that "the whole team in the group has not been paid since the beginning of October."  *Id.* at ECF p. 4.  Defendant contested Plaintiff's invocation of force majeure:  "As we speak, Grain [D]'or holds plenty of material to promote but for over a year (much before the pandemic) has no operating plan, so no plan has been affected by the virus."  *Id.*  She also stated

that "[r]egardless of my opinion . . . the letter states that the suspension starts November 1st, yet I haven't received a payment for October, that is a breach in our contract and I request of you to make amends." *Id.*

On November 18, 2020, Penicaud sent another email to Defendant demanding that Defendant execute an order of payment assigning the payment of her royalty income to Plaintiff. Dkt. No. 50-7.  Penicaud wrote that Defendant's "collection situation in Israel" was not compliant with Paragraphs 4(d) and 12 of her Management Agreement. *Id.* at ECF p. 1. Plaintiff also demanded a copy of certain royalty-income statements Defendant had received since the beginning of her employment contract. *Id.*  The record does not indicate if or how Defendant responded to this email.

On March 5, 2021, Defendant sent an email to counsel for Plaintiff terminating the Management and Recording Agreements.  Dkt. No. 50-8.  The email accused Plaintiff of "clear and fundamental breaches to the agreements" and stated that "the piano and other musical equipment" she was given were gifts to her from De Crecy with whom she had had a romantic relationship. *Id.* at ECF p. 2.  She accused De Crecy, who she claimed "did not take the breakup well," of "trying to force himself back into my life while using unjustified legal violence against me." *Id.*  She indicated that De Crecy "may or may not have used company money to pay" for the piano, but that was an issue that Grain D'or had to address to De Crecy, not to her. *Id.*  At that time, Defendant had no intention of creating any more recordings for Plaintiff.  Plaintiff's Rule 56.1 Statement ¶ 28; Defendant's Rule 56.1 Counterstatement ¶ 28.

On March 13, 2021, Defendant wrote Penicaud complaining about the "multiple emails and texts" he had sent her with "ill intent" and directing him not to contact her "again, about anything, personal or professional." Dkt. No. 50-9.  She stated that any further contact would be

considered harassment and concluded:  "This email is not open for conversation, any reply will

be considered harassment."  *Id.*  On May 8, 2021, by letter from counsel, Plaintiff demanded that

Defendant comply with her contractual obligations, including by signing the royalty-payment

order and confirming that property belonging to Plaintiff remained in Defendant's custody and

was in good condition, both of which were "essential precursors to our Client restarting monthly

payments to you."  Dkt. No. 50-10.  The letter also provided notice that if Plaintiff did not

receive a satisfactory response by May 14, 2021, Plaintiff would take legal action.  *Id.*

## PROCEDURAL HISTORY

This case was initiated by complaint filed by Plaintiff on December 13, 2021.  Dkt.

No. 1.  On June 27, 2022, Defendant filed an answer and counterclaim.  Dkt. No. 13.  In her

counterclaim, Defendant alleged that she was fraudulently induced to enter into the agreements

by the sole member and manager of Grain D'or, De Crecy, who made false representations of his

capabilities to manage Defendant's musical career and promised Defendant that he would marry

her, and that he would separate from his wife and children.  *See generally id.* ¶¶ 24–34.

The Court entered a Case Management Plan and Scheduling Order on July 25, 2022,

setting the close of all discovery for January 5, 2023.  Dkt. No. 17.  The Court amended the

Scheduling Order on November 14, 2022, setting the close of discovery for March 5, 2023, Dkt.

No. 23, and again on March 29, 2023, setting the close of discovery for April 4, 2023, Dkt.

No. 42.

Plaintiff filed this motion for summary judgment on May 1, 2023.  Dkt. No. 45.  Plaintiff

also filed the Stipulation of Undisputed Facts, Dkt. No. 48, a Rule 56.1 Statement, Dkt. No. 49,

and the declarations of Marc Penicaud and Brian Levenson, Dkt. Nos. 50–51, as well as a

memorandum of law, Dkt. No. 52.  On May 16, 2023, Defendant filed a memorandum of law in

opposition to the motion for summary judgment, a response to Plaintiff's Rule 56.1 Statement,

and the declarations of Defendant and Noam Elia in opposition to the motion, Dkt. Nos. 53–56.

Plaintiff filed its reply memorandum in further support of the motion for summary judgment on

May 22, 2023.  Dkt. No. 57.  The Court held oral argument on Plaintiff's motion for summary

judgment on August 29, 2023.  Minute Entry (Aug. 29, 2023).

A jury trial in this case is scheduled for October 23, 2023.  Minute Entry (Apr. 12, 2023).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When the burden of proof at

trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a

lack of evidence to go to the trier of fact on an essential element of the non-movant's claim."

*Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  If the movant meets its

burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a

genuine issue of fact for trial in order to avoid summary judgment."  *Id.*  "An issue of fact is

'material' for these purposes if it 'might affect the outcome of the suit under the governing

law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could

return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92,

97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In

determining whether there are any genuine issues of material fact, the Court must view all facts

"in the light most favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d

62, 69 (2d Cir. 2001), and the movant bears the burden of demonstrating that "no genuine issue

of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002)

(citations omitted).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).  Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  L.R. 56.1(a).  Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  L.R. 56.1(b).  All

statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible." L.R. 56.1(d). "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." L.R. 56.1(c). "[T]he trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, [though] it is not required to consider what the parties fail to point out." *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (citation omitted).

## DISCUSSION

Plaintiff moves for summary judgment on its breach of contract claims under both the Management Agreement and the Recording Agreement. Plaintiff also moves for summary judgment on Defendant's fraudulent inducement counterclaim and what it interprets as a counterclaim for intentional infliction of emotional distress. The Court addresses each in turn.

## I.      Breach of Contract: Management Agreement

Plaintiff argues that Defendant materially breached the Management Agreement when she refused to sign the payment instructions at Plaintiff's request. Dkt. No. 52 at 9. Plaintiff further argues that Defendant was notified of this breach on five separate occasions, and each time she failed to cure the breach. *Id.* This breach, according to Plaintiff, was material "because it went to the root of the deal." *Id.* at 10–11. Defendant counters that it was Plaintiff—not she—who breached the Management Agreement when it unilaterally sent a notice that it was suspending performance on November 3, 2020. Dkt. No. 56 at 6. The Court finds that Plaintiff has not carried its burden to establish it is entitled to summary judgment on the claim of breach of the Management Agreement.

"Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007). A breach is material if it "'go[es] to the root of the agreement between the parties,' and 'is so substantial that it defeats the object of the parties in making the contract.'" *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 414 (S.D.N.Y. 2004) (quoting *Felix Frank Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)). "When one party commits a material breach, the other party is relieved, or excused, from its further performance obligations." *Id.* Plaintiff has not established its entitlement to summary judgment on the claim of breach of the Management Agreement for two independent reasons.

First, Plaintiff suspended performance under the Management Agreement's force majeure provision on November 3, 2020, approximately two weeks before it demanded that Defendant assign her royalty payments to Plaintiff. "A force majeure clause's primary purpose is to 'relieve a party from its contractual duties when its performance has been prevented by a force beyond its control or when the purpose of the contract has been frustrated.' '[W]hen the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure.'" *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 123 (2d Cir. 2022) (citations omitted). "New York law requires courts to construe force majeure clauses narrowly, so that 'only if the force majeure clause specifically includes the event that actually prevents a party's performance will that party be excused.'" *Id.* (quoting *Kel Kim Corp. v. Cent. Mkts., Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987)). "The burden of demonstrating force majeure is on the party seeking to have its performance excused." *Phillips P.R. Core, Inc. v. Tradax Petroleum Ltd.*, 782 F.2d 314, 319 (2d Cir. 1985).

The Management Agreement's force majeure provision reads in relevant part:

> Manager shall have the right to suspend the running of the Term of this Agreement and its obligations hereunder upon written notice to Artist, if for any reason Artist . . . substantially fails to actively pursue her entertainment business career or if the ability of Artist to perform shall become physically or mentally impaired, as a result of such impairment Artist becomes unable to comply with any of her material obligations hereunder.

Management Agreement ¶ 14.  Plaintiff suspended its performance on November 3, 2020 by letter because, it contends, as a result of the COVID-19 pandemic, Defendant was "no[t] . . . in a position to pursue normally your career in this adverse context."  Dkt. No. 54-2 at ECF p. 6. That letter, and Plaintiff's submissions with its reply memorandum, point to the fact that England had initiated a lockdown and that other countries, including France, which limited public performances of artists "until at least the end of the year," were similarly affected by COVID-19. *Id.*; Dkt. No. 57 at 7.  However, Plaintiff has presented no evidence that Defendant was unable to "actively pursue her entertainment business career" or "comply with any of her material obligations" under the Management Agreement.  Plaintiff has presented evidence that London was in lockdown when it sent Defendant the force majeure notice, Dkt. No. 57-3, and there is evidence in the record that Defendant was living in London at the time, *see* Dkt. No. 55-1 at 11–12.  However, these facts alone do not establish that Defendant was unable to actively pursue her career; though Defendant may have been prohibited from performing concerts in France and London, the evidence that Plaintiff presented does not establish that Defendant was unable to pursue her career in other ways, including by recording songs, *see* Dkt. No. 57-4 at ECF p. 8 (noting that at Tier 2, the level London was at as of October 15, 2020, there could be "[n]o household mixing indoors" but not indicating how this rule applied to offices and other places of business); traveling to other locations to perform concerts, *see id.* (noting that at Tier 3, a level above London's tier, there was "[g]uidance against travelling in and out of the area," but nothing

categorically banning such travel); or pursuing her artistic career in other ways contemplated by the Management Agreement, *see* Management Agreement ¶ 2(d) (suggesting that Defendant could exploit her personality in the media and through "photographic, likeness, voice and artists and musical materials"); *see also id.* ¶ 6 (noting that Plaintiff was not responsible for booking engagements for Defendant and thus suggesting that making future bookings was a way for Defendant to pursue her career as a musician).  In sum, Plaintiff has not established that a force majeure event occurred such that its performance was excused.  It is thus a question of fact whether Plaintiff's suspension of the contract on November 3, 2023 gave rise to a material breach of the contract such that Defendant's failure to perform under the contract by assigning Plaintiff her royalty rights was excused.

Even if the Court could conclude that a force majeure had occurred, it would be unable to conclude that Defendant's failure to assign Plaintiff her royalty rights was a material breach of the Management Agreement.  Paragraph 17 governs default under the contract.  That paragraph reads in full:

> It is agreed that no Party herein shall be deemed to be in breach or default hereunder, which breach or default would otherwise be deemed a material breach or default, unless and until the aggrieved Party shall first give to the Party allegedly in breach of default written notice *by certified or registered mail, return receipt requested*, describing the exact service which the aggrieved Party requires of the Party allegedly in breach or default.  The Party allegedly in breach of default shall thereafter have a period of thirty (30) consecutive days to remedy such breach or default.

Management Agreement ¶ 17 (emphasis added).  Ordinarily, "substantial compliance with [a] notice provision will suffice."  *Peter Scalamandre & Sons, Inc. v. FC 80 Dekalb Assocs., LLC*, 12 N.Y.S.3d 133, 137 (1st Dep't 2015).  However, when the notice provision is a condition-precedent, strict compliance is required.  *Id.* at 136.

"Under New York law, a condition precedent is an act or event which must occur before another party's duty to perform its promise arises." *LaSalle Bank Nat. Assoc. v. Citicorp Real Estate, Inc.*, 2003 WL 21671812, at *3 (S.D.N.Y. July 16, 2003).  "Over time, the law has come to recognize and enforce the use of linguistic conventions to create conditions precedent." *Israel v. Chabra*, 537 F.3d 86, 93 (2d Cir. 2008).  These "linguistic conventions" include "'if,' 'on condition that,' 'provided that,' 'in the event that,' and 'subject to.'"  *Bank of N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Cap., Inc.*, 821 F.3d 297, 305 (2d Cir. 2016) (citation omitted). Importantly, the New York Court of Appeals has recognized that the language "unless and until" is the kind of "unmistakable language of condition" that "unambiguously establishes an express condition precedent rather than a promise." *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995).

Here, the notice provision uses "unmistakable language of condition":  The default provision of the Management Agreement provides that "no Party herein shall be deemed to be in breach or default hereunder . . . *unless and until* the aggrieved Party shall first give to the Party allegedly in breach of default written notice by certified or registered mail, return receipt requested."  Management Agreement ¶ 17 (emphasis added).  Thus, in order for Defendant's failure to assign Plaintiff her royalty payments to be deemed a material breach of the Management Agreement, Plaintiff was required to give Defendant written notice of the alleged breach by certified or registered mail.  However, there is no evidence in the record that Plaintiff provided notice by certified or registered mail.  Plaintiff first notified Defendant that she "was in breach of the Management [Agreement]" on November 18, 2020 "by email."  Dkt. No. 50 ¶ 17. It is undisputed that Plaintiff sent the payment instructions four more times, on January 13, 2021, February 22, 2021, March 31, 2021 and May 8, 2021.  Stipulation of Undisputed Facts ¶ 22.  But

there is nothing in the record to suggest that any of these four notifications were delivered by certified or registered mail, as required under the Management Agreement.  Thus, the Court would be unable to conclude, as Plaintiff argues, that Defendant materially breached the Management Agreement by failing to assign her royalty payments to Grain D'or.

As a result, Plaintiff has not demonstrated that, as a matter of law, Defendant materially breached the Management Agreement.  Thus, a jury could find that Defendant's non-performance is excused by Plaintiff's own breach of the Management Agreement.

## II.     Breach of Contract: Recording Agreement

Plaintiff next argues that it is entitled to judgment as a matter of law on its breach of contract claim under the Recording Agreement.  Plaintiff contends that Defendant materially breached the Recording Agreement on two occasions:  First, when Defendant failed to deliver eight recordings during the initial term of the Recording Agreement and next when Defendant failed to deliver six recordings during the first option period of the Recording Agreement.  Dkt. No. 52 at 12.  Defendant counters that Plaintiff's breach preceded her own:  Plaintiff failed to pay her the amount required under the Recording Agreement for October 2020 and issued the suspension notice on November 3, 2020, both of which were before the expiration of the first option period.  Dkt. No. 56 at 6.  The Court agrees that Plaintiff has not presented sufficient evidence to establish as a matter of law that Defendant materially breached the Recording Agreement first.

It is undisputed that Defendant delivered fewer than eight songs during the initial term of the Recording Agreement.  Though Defendant testified that she recorded "around eight" songs for Grain D'or, Dkt. No. 55-1 at 15, the rest of her testimony makes clear that she recorded no more than seven songs during the initial term of the Recording Agreement, *see id.* at 15–17.  However, to the degree that Defendant was in breach of the Recording Agreement during the

initial term, there is a question of fact whether Plaintiff waived that breach.  "It is well-established that where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach."  *Kumaran v. Northland Energy Trading, LLC*, 2021 WL 797113, at *5 (S.D.N.Y. Feb. 26, 2021), *reconsideration denied*, 2022 WL 704704 (S.D.N.Y. Mar. 9, 2022); *see also N.Y. Tel. Co. v. Jamestown Tel. Corp.*, 26 N.E.2d 295, 297–98 (N.Y. 1940) ("[A]s matter of law, right to rescind must be exercised promptly after the injured party learns of the wrong.  Acceptance of benefit under the contract with knowledge of the wrong constitutes a waiver of the wrong.").  "If a party chooses to continue performance, it must give notice of breach to the other side, or it waives its right to sue the breaching party."  *Medinol Ltd. v. Bos. Sci. Corp.*, 346 F. Supp. 2d 575, 620 (S.D.N.Y. 2004).

Here, Plaintiff continued to perform under the Recording Agreement and to accept the benefits of that agreement despite the breach of the agreement during the initial term.  As Plaintiff admits in its Rule 56.1 Statement, the first option period "commenced on November 1, 2019 because Grain D'or did not send any notice to the contrary," Plaintiff's Rule 56.1 Statement ¶ 39, and Plaintiff continued to pay Defendant during this period, *see id.* ¶ 8.  Plaintiff does not present any evidence that it lacked knowledge that Defendant failed to deliver eight songs during the initial term and, viewing the evidence in the light most favorable to Defendant, as the Court must, the only logical conclusion is that Plaintiff knew that Defendant had not fully performed the contract at the time Plaintiff exercised the first option and thus availed itself of the benefits of the Agreement, including its exclusivity provision.  Plaintiff's decision to proceed in the face of this breach and to accept its benefits without giving notice of the breach to Defendant thus could be read to constitute waiver.

Nor has Plaintiff established as a matter of law that Defendant breached the contract during the first option period.  It is undisputed that Defendant did not deliver any recordings during the first option period, which ran for 18 months beginning on October 31, 2019.  Stipulation of Undisputed Facts ¶ 24.  However, it remains a question of fact whether Defendant's performance during the first option period was excused because of Plaintiff's breach.  On November 3, 2020, Plaintiff sent Defendant a notice that it was suspending its performance suspended its performance under the contract's force majeure provision as a result of the COVID-19 pandemic.  Dkt. No. 54-2 at ECF p. 6 ("[T]he company has made the decision to suspend your contracts for an initial period of two months for force majeure, starting November 1st, 2020.").  The problem with the contention in Plaintiff's letter is that, although the Management Agreement has a force majeure provision, the Recording Agreement does not.  Thus, Plaintiff could not have invoked force majeure under the Recording Agreement and Plaintiff's suspension of the contract might be deemed a material breach of the agreement, excusing Defendant's nonperformance.

There is an argument—one that Plaintiff does not advance here—that the provision in the Management Agreement that the Recording Agreement "terminate[s] in case of the *termination of the Management Agreement*," Management Agreement ¶ 3 (emphasis added), could be read to extend the invocation of force majeure under the Management Agreement to the Recording Agreement.  However, the force majeure provision gives Plaintiff the right to *suspend* the Management Agreement, not to terminate it.  Thus, it is doubtful that the declaration of a force majeure under the Management Agreement could be read, through Paragraph 3 of the Management Agreement, to effect a termination of the Recording Agreement.  Regardless, the Court need not settle this question now because, as discussed above, there is a genuine issue of

material fact whether Plaintiff properly invoked force majeure under the Management

Agreement and thus, even if Paragraph 3 could be read to extend the force majeure clause to the

Recording Agreement, there would also necessarily be a genuine issue of material of fact

whether force majeure was properly invoked with respect to the Recording Agreement.

Finally, Plaintiff appears to argue that even if it suspended performance—and failed to

pay Defendant in October as a result—the suspension was not a breach of the Recording

Agreement "because Grain D'or had pre-paid $108,400." Dkt. No. 57 at 6. There are at least

two flaws in that argument. First, Plaintiff had obligations under the Recording Agreement

beyond paying Defendant, including obligations to market and promote Defendant's recordings,

which were also suspended when Plaintiff declared force majeure. *See, e.g.*, Recording

Agreement ¶ 1 ("The Producer undertakes to record the Works . . . and to use its reasonable best

efforts to market and promote the recordings."); *id.* ¶ 5 (obligation to pay for recordings and an

artistic director); *id.* ¶ 7 (obligation to seek artist's prior consent in matters involving her moral

rights). Second, it is a disputed fact whether the additional money that De Crecy paid Defendant

was a prepayment under the contract or a personal payment from De Crecy. Although Plaintiff's

secretary asserts in a declaration that "[t]he additional amounts paid by Grain D'or during the

first three contract years were prepaid monthly remuneration to Wizman," Dkt. No. 50 ¶ 14,

there is evidence in the record that challenges that contention. Defendant declares that De Crecy

"used to give me cash, take me to fancy restaurants, buy me gifts," that he "would pay our living

expenses including the monthly rent," and that "[a]ny monies paid to me by plaintiff above the

amounts specified in the [Recording Agreement] were made at De Crecy's instructions to pay

our living expenses including our monthly rent." Dkt. No. 54 ¶¶ 5, 11, 20. And in emails to

Penicaud contemporaneous with the suspension, Defendant challenged the characterization of

some of these payments as prepayments under the contract and instead asserted that they were given to her by De Crecy for living expenses and "[t]he money . . . was never a loan or a deposit." Dkt. No. 54-2 at ECF p. 2. It is a question for the factfinder at trial, not the Court on summary judgment, whether Penicaud's or Defendant's characterization of these payments is more credible. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)).

Thus, Plaintiff has failed to establish as a matter of law that Defendant breached the Recording Agreement either during the initial term or the first option period.[4]

## III.   Counterclaims

Defendant brings a counterclaim for fraudulent inducement and what Plaintiff interprets as a counterclaim for intentional infliction of emotional distress ("IIED"). The Court addresses each in turn. Because the parties do not dispute that New York law applies to these claims, the Court assumes for the purposes of this motion that New York law governs. *See Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, 2019 WL 1244294, at *6 (S.D.N.Y. Mar. 18, 2019) ("Where '[t]he parties' briefs assume' that a certain body of law controls, 'such implied consent is sufficient to establish choice of law.'" (quoting *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000))); *Pac. Indem. Co. v. Kiton Corp.*, 2022 WL 4237092, at *2 (S.D.N.Y. Sept. 14, 2022) (same).

Plaintiff moved for summary judgment on Defendant's fraud counterclaim and an apparent IIED counterclaim and presented arguments in support of its motion. *See* Dkt. No. 52

---

[4] Because the Court has found that Plaintiff has not carried its burden with respect to its breach of contract claims, it does not address whether Defendant's breach of fiduciary duty argument, *see* Dkt. No. 56 at 4–5, is an affirmative defense that is properly before this Court or the merits of that argument.

at 15–18.  Defendant does not address these arguments in her opposition brief.  Instead,

Defendant argues that Plaintiff breached a fiduciary duty it owed to Defendant through De

Crecy.  *See* Dkt. No. 56 at 4–5.  However, nowhere in its answer does Defendant assert a claim

for breach of fiduciary duty.  Accordingly, Defendant's fiduciary duty claim cannot be asserted

at this stage.  *See Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 170 F.R.D. 111, 119

(S.D.N.Y.1997) ("[I]t is inappropriate to raise new claims for the first time in submissions in

opposition to summary judgment.").

The fact that Defendant did not address in her memorandum in opposition to summary

judgment Plaintiff's arguments on her counterclaims does not alone entitle Plaintiff to summary

judgment.[5]  As the Second Circuit has held, "[e]ven when a motion for summary judgment is

unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to

judgment as a matter of law."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 242

(2d Cir. 2004).  The moving party must still bear its burden and "establish that the undisputed

facts entitle him to 'a judgment as a matter of law.'"  *Id.*at 246 (citation omitted).  The rule

should be no different here:  That Defendant has not addressed Plaintiff's arguments does not

entitle Plaintiff to judgment as a matter of law; Plaintiff must still demonstrate that there is no

genuine issue of material fact on Defendant's counterclaims.

Plaintiff, however, has carried its burden on both the fraudulent inducement and the

apparent IIED counterclaims.  In order to prove a claim for fraudulent inducement, Defendant

must establish the following evidence: "(1) a material misrepresentation or omission of a fact, (2)

knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the

plaintiff, and (5) damages."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d

---

[5] Defendant addressed the counterclaims at oral argument.

160, 170 (2d Cir. 2015) (citing *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976 (N.Y. 2009)).  Here, Defendant's fraud claim fails for two independent reasons: she has failed to establish that there is a dispute of material fact as to whether there was a material misrepresentation or omission and that her reliance was reasonable.

Wizman does not identify any material misrepresentation made by Plaintiff.  Defendant declares that De Crecy "told me he had the resources and relationships in the music industry to support my career, all through his company [Grain] D'or LLC."  Dkt. No. 54 ¶ 4.  Defendant, however, does not identify how this statement was false.  She does declare that she discovered after signing the contracts that Grain D'or "was not a producer, label company or artist's manager."  *Id.* ¶ 10.  However, those facts do not establish that De Crecy or Grain D'or lacked the resources and relationships in the music industry to help Wizman in her career.[6]  *See Missigman v. USI Ne., Inc.*, 131 F. Supp. 2d 495, 516 (S.D.N.Y. 2001) (granting summary judgment on fraud claim because "there is no evidence that [defendant] knowingly made any false, material misrepresentations on which plaintiff relied").

---

[6] During oral argument, Defendant's counsel said that there was evidence in the record that established that De Crecy lacked the resources and relationships to help Wizman in her career and pointed the Court generally to De Crecy's deposition, acknowledging that he did not cite to any such evidence in Defendant's Rule 56.1 Counterstatement.  When the Court asked for a particular cite in the deposition, Defendant's counsel was unable to identify a page number or any other evidence.  And, as the Second Circuit has held, "a court 'is not required to consider what the parties fail to point out' in their Local Rule 56.1 statements."  *Holtz*, 258 F.3d at 73. Even if the Court were inclined to scour the record, the only part of De Crecy's deposition that could be read to support Plaintiff's claim that his early statements were material misrepresentations are De Crecy's statement that his "knowledge of music [was] not good."  Dkt. No. 55-2 at 21.  However, in the same response, De Crecy discusses how he "surround[ed] myself with professions who could help me" and he described all the individuals he hired to help Defendant in her singing career.  *Id.* at 21–22.  Contrary to supporting Defendant's argument that these statements create a dispute of fact as to whether De Crecy made material representations, they support that De Crecy had both the resources and relationships to hire individuals to help Defendant's music career.

Second, to the degree that De Crecy did make misrepresentations about the ability of Grain D'or to support Defendant's career, Defendant's reliance on any of these allegedly false statements would not have been justifiable. "In assessing whether reliance on allegedly fraudulent misrepresentations is reasonable or justifiable, New York takes a contextual view, focusing on the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision." *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004). "Ordinarily there is no duty to exercise due diligence, and cases following *Mallis* [*v. Bankers Trust Co.*, 615 F.2d 68, 80–81 (2d Cir. 1980),] have described the necessary showing of care as 'minimal diligence' or 'negating its own recklessness.'" *Banque Franco-Hellenique de Com. Int'l et Mar., S.A. v. Christophides*, 106 F.3d 22, 27 (2d Cir. 1997) (citation omitted). "[W]here a party has 'the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means, he cannot claim justifiable reliance on defendant's misrepresentations." *Brock Cap. Grp. LLC v. Siddiqui*, 2022 WL 2047589, at *3 (S.D.N.Y. June 7, 2022) (citation omitted). "While the law does not require that a defrauded party go to the ends of the earth to discover the falsity of a statement, patent foolishness is not excused." *Christophides*, 106 F.3d at 26.

Although it is rare for a court to grant summary judgment on grounds of reasonable reliance, such a disposition is appropriate here. Defendant consulted with an attorney before entering into the Management and Recording Agreements. Stipulation of Undisputed Facts ¶¶ 3–4. She admits that she had never heard of Grain D'or, *id.* ¶ 5, and testified that she did not do any research on Grain D'or before signing the agreements and never asked whether Grain D'or represented any other artists, Dkt. No. 55-1 at 38–39. She further testified that at the time she signed the Recording Agreement, she understood that she was the first artist to sign an

agreement with Grain D'or.  *Id.* at 41.  She has not identified any diligence exercised by her or her lawyer.  Thus, Defendant did not conduct even the minimal diligence necessary to establish justifiable reliance and her fraud claim must fail as a matter of law.  *See Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 337–39 (2d Cir. 2011) (noting that a party "may not justifiably rely on a misrepresentation if, through minimal diligence, the [party] should have discovered the truth").

Plaintiff also reads Defendant's answer to suggest that she brings a counterclaim for IIED.[7]  In Defendant's answer, she pleads under a catchall section titled "Defendant's Counterclaims" that "Wizman became emotionally distressed and unable to engage in the musical performances that she trained for."  Dkt. No. 13 ¶ 33.  Nowhere, however, does Defendant indicate that she was bringing a claim for intentional infliction of emotional distress.  And in context, it is clear that she was not.  That allegation follows a string of allegations related to the fraudulent inducement counterclaim, *see, e.g.*, *id.* ¶ 28 ("De Crecy fraudulently induced Defendant to execute the subject Agreements."), and begins with "[a]s a consequence thereof," *id.* ¶ 33, suggesting that the emotional distress is an allegation that goes to the damages she suffered as a result of Plaintiff's fraud, not an attempt to establish a standalone tort claim for emotional distress.  This conclusion is supported by the wherefore paragraph, which seeks "judgment on the counterclaim," in the singular, and not "counterclaims" plural.  *Id.* at ECF p. 13.

---

[7] Despite Defendant's assertion to the contrary during oral argument, the answer cannot be read to bring a claim for negligent infliction of emotional distress, because, under either the bystander or direct duty theory, a claim for negligent infliction of emotional distress brought under New York law requires some threat to the injured party's physical safety.  *See Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996).  Defendant's answer contains no allegations with respect to her physical safety.

"[T]he central purpose of a complaint is to provide the defendant with notice of the claims asserted against it." *Caro Cap., LLC v. Koch*, 2023 WL 1103668, at *6 (S.D.N.Y. Jan. 30, 2023) (alteration in original) (quoting *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006)).   Because the answer does not raise a counterclaim of IIED, "it would be improper to consider [it] at the summary judgment stage." *Knutson v. G2 FMV, LLC*, 2020 WL 2765771, at *3 (S.D.N.Y. May 28, 2020) (Nathan, J.).

Even if the Court could conclude that the answer brings a counterclaim for IIED, that counterclaim would fail as a matter of law because Defendant has presented no evidence that would support her claim.  Defendant has submitted an unsigned letter from Jewish Women's Aid describing her interactions with the organization, Dkt. No 54-4 at ECF p. 1, and a report from Dr. Zoe Chouliara a psychologist who has treated Defendant, *id.* at ECF pp. 2–4.  Neither letter, however, is admissible on summary judgment.  "To be admissible in a summary judgment proceeding, an affidavit must be sworn to before an officer authorized to administer oaths, such as a notary public.  Alternatively, under 28 U.S.C. § 1746, an unsworn declaration, which is dated and signed by the declarant 'under penalty of perjury,' and verified as 'true and correct,' may be used in lieu of a sworn affidavit." *Lamoureux v. AnazaoHealth Corp.*, 2010 WL 4875870, at *2 (D. Conn. Nov. 18, 2010) (internal citations omitted).  Neither report, however, is sworn or signed under penalty of perjury; the Jewish Women's Aid letter is unsigned and the report from Dr. Chouliara is not signed under penalty of perjury.  Thus, neither are admissible on summary judgment.[8]  Plaintiff argues that "there is absolutely no evidence that Wizman has

---

[8] Defendant herself declares that "De Crecy[ had a] need to control me including, the hidden cameras, a daily account of where I went, what I did, who I saw, what I spent, and what I wore." Dkt. No. 54 ¶ 23.  However, Defendant does not declare that she suffered any emotional distress. She declares that De Crecy's actions "were unbearable and were his form of torture and infliction of mental and emotional distress." *Id.*  That the actions were "unbearable" does not

suffered any emotional distress produced in this case." Dkt. No. 52 at 17.  At that point,

Defendant was obligated to put forward evidence that would create a genuine issue of fact that

she did in fact suffer emotional distress.  *See Jaramillo*, 536 F.3d at 145 ("When the burden of

proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point

to a lack of evidence to go to the trier of fact on an essential element of the non-movant's claim.

In that event, the nonmoving party must come forward with admissible evidence sufficient to

raise a genuine issue of fact for trial in order to avoid summary judgment." (internal citations

omitted)).  Defendant has not put forward any such evidence, and thus any IIED claim would fail

as a matter of law.

The Court thus concludes that Defendant has not brought an IIED claim and, if she did, it

would fail as a matter of law.

## CONCLUSION

Accordingly, Plaintiff's motion for summary judgment on its breach of contract claims is

DENIED, but its motion for summary judgment on Defendant's fraudulent inducement

counterclaim is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. No. 45.


SO ORDERED.


Dated: August 30, 2023
New York, New York                           LEWIS J. LIMAN
                                             United States District Judge

---

suggest that Defendant suffered emotional distress as a result.  And stating that De Crecy sought
to inflict mental and emotional distress does not necessarily imply that Defendant in fact
experienced such distress through De Crecy's actions.